1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   ELAINE DOUGAN,                      CASE NO. C20-0818JLR

11                          Plaintiff,   ORDER GRANTING MOTION
                                         TO COMPEL ARBITRATION
         v.                              AND STAY PROCEEDINGS
12
13   THE CHILDREN'S PLACE, INC.,

14                          Defendant.

## I.   INTRODUCTION

16        Before the court is Defendant The Children's Place, Inc.'s ("TCP") motion to

17   compel arbitration and stay proceedings.  (Mot. (Dkt. # 11).)  Plaintiff Elaine Dougan

18   opposes TCP's motion.  (Resp. (Dkt. # 14).)  TCP filed a reply.  (Reply (Dkt. # 19).)

19   Having considered the motion, the parties' submissions regarding the motion, the

20   //

21   //

22   //

1 relevant portions of the record, and the applicable law,[1] the court grants TCP's motion to

2 compel arbitration.

3                          **II.      BACKGROUND**

4 **A.     Factual Background**

5          This case is a proposed class action arising from Ms. Dougan's allegations that

6 TCP sent emails with subject lines advertising false or misleading discounts to Ms.

7 Dougan and others in Washington.  (*See generally* Compl. (Dkt. #1).)  TCP is a specialty

8 retailer that sells apparel, accessories, footwear, and other items for infants and children

9 online and in retail stores nationwide, including in Washington.  (Alzate Decl. (Dkt. # 12)

10 ¶ 2.)  Ms. Dougan alleges that TCP "creates purported list prices for its products which

11 are inflated far above the products' regular and true selling prices."  (Compl. ¶ 13.)  As a

12 result, when TCP offers discounted and sale prices, "the list prices and claimed discounts

13 are false and inflated because [TCP] rarely or never offers the products at their stated list

14 price." (*Id.*; *see also id.* ¶¶ 14-16.)

15          On November 22, 2018, Ms. Dougan voluntarily enrolled in TCP's My Place

16 Rewards Program ("MPR Program" or "Program") at a TCP retail store in Kennewick,

17 Washington.  (Alzate Decl. ¶ 3, Dougan Decl. (Dkt. # 15) ¶¶ 4-9.)  The MPR Program

18 provides loyalty points, discounts, and reward credit to TCP shoppers.  (*See, e.g.*, Alzate

19 Decl. ¶ 7 & Ex. D at 3 (describing Program benefits).)  TCP sends Program

20

21          [1] TCP requested oral argument.  (*See* Mot. at 1.)  The court finds oral argument would not
be helpful to the disposition of this motion, and therefore declines to hold oral argument.  *See*
22 Local Rules W.D. Wash. LCR 7(b)(4).

communications, offers, and reward certificates to Program members by email.  (*See id.* at 6.)

TCP posts signage throughout its stores—including the store at which Ms. Dougan shops—to advertise the MPR Program.  (Alzate Decl. ¶ 4 (describing TCP's general policies and procedures); Hazard Decl. (Dkt. # 20) ¶ 2 (describing procedures at stores in Washington and explaining where in the store the signs were posted); *see* Alzate Decl. ¶ 4 & Exs. A-C (signage).)  The following language appears in fine print at the bottom of several of these signs:

> The My Place Rewards Program is provided by The Children's Place, Inc. and its terms may change at any time. For full Rewards Terms and Conditions, please visit childrensplace.com/rewards-terms.

(*See* Alzate Decl. Exs. A & C.)  Ms. Dougan states that she did not see any signs or notices "about terms and conditions relating to the [MPR Program]" when she visited the Kennewick store and enrolled in the MPR Program.  (Dougan Decl. ¶ 22.)  She does not, however, deny that signs advertising the Program were posted in the store.  (*See generally id.*)

In 2018, TCP's standard operating procedure in its Washington stores for enrolling customers in the MPR Program required TCP's sales associates to ask a customer if she was already a Program member or wanted to become a member before ringing up the customer's sales transaction.  (Alzate Decl. ¶ 5.)  According to TCP, a customer who wanted to enroll in the Program would provide her name and contact information, including email address, to the sales associate.  (*Id.*)  The sales associate would then hand the customer a printed copy of a brochure containing the MPR Program terms and

1  conditions ("MPR Brochure") along with an enrollment receipt.  (Alzate Decl. ¶ 6; *see*

2  *also* Hazard Decl. ¶ 4 (stating that Washington sales associates are trained to inform the

3  customer that the document contains information on the terms and conditions and

4  benefits of the MPR Program).)  Printed copies of the MPR Brochure were also displayed

5  and available in stands at each cash register in the store.  (Hazard Decl. ¶¶ 5-8; *see id.*

6  Exs. F & G.)

7       The MPR Brochure is a 30-page double-sided document that includes information

8  about both the MPR Program and TCP's MPR Credit Card Program.  (Hattis Decl. (Dkt.

9  # 16) ¶ 4 & Ex. B; *see also* Hattis Decl. ¶ 7 & Ex. E (photographs of the April 2019

10 version of the printed brochure).)  Nine pages of the MPR Brochure are dedicated to the

11 MPR Program and 21 pages are dedicated to the MPR Credit Card Program.  (*See* Hattis

12 Decl. Ex. B.)

13      Each side of the MPR Brochure has a different cover.  The MPR Program side has

14 an orange cover and is entitled "MY PLACE REWARDS."  (Hattis Decl. Ex. B at 2.)

15 The cover does not mention that the brochure contains terms and conditions for the

16 Program.[2]  (*Id.*)  The first mention of terms and conditions for the MPR Program appears

17 on the inside cover of the brochure's contents in fine print under a description of the

18 benefits provided with the MPR Program and MPR Credit Card Program. (*Id.* at 3

19 (stating "Turn page for terms and conditions.").)  The second and third pages of the

20

21

22  [2] The MPR Credit Card Program side has a blue cover and is entitled "MY PLACE
REWARDS CREDIT CARD."  (Hattis Decl. Ex. B at 31.)

contents also refer to terms and conditions in fine print.  (*Id*. at 4-5.)  Like the store

signage, these pages state, in relevant part:

> The My Place Rewards Program is provided by The Children's Place, Inc. and its terms may change at any time. For full Rewards Terms and Conditions, please visit childrensplace.com/rewards-terms.

(*Id*.)

The Program terms and conditions begin on the fourth page of the MPR Brochure

with a message in large boldface type stating:

> PLEASE NOTE: THESE TERMS AND CONDITIONS CONTAIN AN ARBITRATION CLAUSE AND CLASS ACTION WAIVER.  THE WAIVER AFFECTS HOW DISPUTES WITH THE CHILDREN'S PLACE ARE RESOLVED.  BY ACCEPTING THESE TERMS AND CONDITIONS, YOU AGREE TO BE BOUND BY THIS ARBITRATION PROVISION.  PLEASE READ IT CAREFULLY.

(*Id*. at 6.)  The specific terms setting forth the "Applicable Law and Mandatory

Agreement to Arbitrate on an Individual Basis" begin on the fifth page of the terms and

conditions and the eighth page of the brochure.  (*Id*. at 10.)

Shortly after a customer completed her enrollment in the MPR Program, TCP

would send her two emails: an email asking the customer to confirm her email address

and, subsequently, a welcome email that included the customer's MPR Program rewards

number.  (Alzate Decl. ¶ 8.)  Each of these emails included a hyperlink to the full text of

the terms and conditions on the MPR Program webpage of TCP's website.  (*Id*.)

The following text appears at the beginning of the MPR Program terms and

conditions webpage:

> PLEASE NOTE: THESE TERMS AND CONDITIONS CONTAIN AN ARBITRATION CLAUSE AND CLASS ACTION WAIVER.  THE

WAIVER AFFECTS HOW DISPUTES WITH THE CHILDREN'S PLACE AND GYMBOREE ARE RESOLVED.  BY ACCEPTING THESE TERMS AND CONDITIONS, YOU AGREE TO BE BOUND BY THIS ARBITRATION PROVISION.  PLEASE READ IT CAREFULLY.

(Alzate Decl. ¶ 17 & Ex. E at 1 (current website terms and conditions).)

On November 22, 2018, the TCP sales associate followed the general process above to enroll Ms. Dougan in the MPR Program.  (Dougan Decl. ¶¶ 4-11.)  Ms. Dougan states, however, that neither the TCP sales associate nor anyone else at the store handed her a copy of the MPR Brochure, nor did anyone say anything to her about the brochure or about terms and conditions that governed her membership.  (Dougan Decl. ¶¶ 13-15, 18, 20-21.)  Indeed, Ms. Dougan states that she never saw the MPR Brochure until August 2, 2020.  (*Id.* ¶ 19.)  Although Ms. Dougan states that she never saw an email from TCP "about any terms and conditions relating to the [MPR Program]" (Dougan Decl. ¶ 23), TCP's records show that Ms. Dougan received both the email asking her to confirm her email address and the welcome email on November 23, 2018 (Alzate Decl. ¶ 13).  TCP's records also show that Ms. Dougan used her membership after she enrolled in the Program and was assigned reward coupons on November 24, 2018 and October 8, 2019.  (*Id.* ¶ 14.)

## B.   Procedural Background

Ms. Dougan filed her complaint in this action on May 30, 2020.  (Compl.)  Ms. Dougan alleges on behalf of herself and a proposed class that TCP violated the Washington Commercial Electronic Mail Act ("CEMA"), ch. 19.190 RCW, and the Washington Consumer Protection Act ("CPA"), ch. 19.86 RCW, by transmitting emails

1    with subject lines advertising false or misleading discounts.  (*Id.* ¶¶ 32, 42-74.)  Ms.

2    Dougan seeks to enjoin TCP from sending emails that include false or misleading

3    discounts.  (*Id.* at 20 ¶¶ 2, 8.)  She also seeks actual and statutory damages under the

4    CPA.  (*Id.* at 20 ¶¶ 4-6.)

5           Ms. Dougan alleges that since at least March 2019, TCP "has transmitted hundreds

6    of commercial emails containing false or misleading information" about discounts "to

7    thousands of Washington State consumers."  (*Id.* ¶¶ 22-23; *see, e.g., id.* Ex. A (listing 250

8    emails Ms. Dougan received between March 5, 2019 and December 31, 2019 that she

9    alleges have false or misleading information about discounts in their subject lines).)  She

10   alleges that statements such as "XX% Off" in the subject line of the emails are false or

11   misleading because they are "based on [TCP]'s self-created and inflated fictitious list

12   prices."  (*Id.* ¶ 24.)

13          TCP filed the instant motion to compel arbitration on July 10, 2020.  (Mot.)  On

14   September 10, 2020, the court granted TCP's motion for relief from the deadlines in the

15   court's scheduling orders regarding initial disclosures (Dkt. # 21) and class certification

16   (Dkt. # 22) pending its ruling on TCP's motion to compel arbitration.  (Order Granting

17   Relief from Deadlines (Dkt. # 26).)

18                              **III.    DISCUSSION**

19   **A.    Standard for Motions to Compel Arbitration**

20          The Federal Arbitration Act ("FAA"), 9 U.S.C. § 2, governs arbitration

21   agreements in any contract affecting interstate commerce.  *See Circuit City Stores, Inc. v.*

22   *Adams*, 532 U.S. 105, 119 (2001).  Under the FAA, arbitration agreements "shall be

1  valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity

2  for the revocation of any contract."  9 U.S.C. § 2.  The FAA "reflect[s] both a liberal

3  policy favoring arbitration . . . and the fundamental principle that arbitration is a matter of

4  contract."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal

5  quotation marks and citations omitted).  "In line with these principles, courts must place

6  arbitration agreements on an equal footing with other contracts . . . and must enforce

7  them according to their terms."  *Id.* (internal quotation marks and citations omitted).

8       Section 4 of the FAA provides a judicial remedy where a party seeks to compel

9  another party to arbitrate a dispute.  *See* 9 U.S.C. § 4.  Under Section 4, "[a] party

10  aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written

11  agreement for arbitration may petition any United States district court which, save for

12  such agreement, would have jurisdiction . . . of the subject matter of a suit arising out of

13  the controversy between the parties," for an order compelling arbitration.  *Id.*

14       On a motion to compel arbitration, the court's role under the FAA is generally

15  "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does,

16  (2) whether the agreement encompasses the dispute at issue."  *Chiron Corp. v. Ortho*

17  *Diagnostic Sys.*, 207 F.3d 1126, 1130 (9th Cir. 2000); *see also Meadows v. Dickey's*

18  *Barbecue Rests. Inc.*, 144 F. Supp. 3d 1069, 1075 (N.D. Cal. 2015).  "[U]pon being

19  satisfied that the making of the agreement for arbitration or the failure to comply

20  therewith is not in issue, the court shall make an order directing the parties to proceed to

21  arbitration in accordance with the terms of the agreement."  9 U.S.C. § 4.  The parties do

22  not appear to dispute that Ms. Dougan's claims are within the scope of TCP's arbitration

1    provision.  (*See generally* Mot., Resp.)  The court, therefore, focuses on whether a valid

2    agreement to arbitrate exists.

3        As the party seeking to compel arbitration, TCP bears "the burden of proving the

4    existence of an agreement to arbitrate by a preponderance of the evidence." *Norcia v.*

5    *Samsung Telecomm. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017).  "[A]rbitration is a

6    matter of contract and a party cannot be required to submit to arbitration any dispute

7    which he has not agreed to so submit."  *Id.* (quoting *AT&T Techs., Inc*, 475 U.S. at 648)

8    (alteration in original).  In analyzing the parties' arguments about contract formation, the

9    court applies "ordinary state-law principles that govern the formation of contracts" to

10   decide whether an agreement to arbitrate exists.  *See id.* (quoting *First Options of Chi.,*

11   *Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

12   **B.    Ms. Dougan Has Assented to Arbitration**

13       The parties agree that Washington law applies to determine whether the parties

14   formed a contract.  (Mot. at 7-8; Resp. at 4.)  Under Washington law, in order to form a

15   valid contract, the contracting parties must "objectively manifest their mutual assent."

16   *Keystone Land & Dev. Co. v. Xerox Corp.*, 94 P.3d 945, 949 (Wash. 2004).  "Generally,

17   manifestations of mutual assent will be expressed by an offer and acceptance."  *Id.*  In the

18   context of online agreements, the existence of mutual assent turns on whether the

19   consumer had reasonable notice of the agreement.  *Wilson v. Huuuge, Inc.*, 944 F.3d

20   1212, 1219 (9th Cir. 2019) (citing *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175

21   (9th Cir. 2014).  "Washington does not allow parties to shirk contract obligations if they

22   had actual or constructive notice of the provisions."  *Id.* (citing *W. Consultants, Inc. v.*

ORDER - 9

1  *Davis*, 310 P.3d 824, 827-28 (Wash. Ct. App. 2013)).  A consumer "cannot successfully

2  argue that the contract is unenforceable as long as [she] was not deprived of the

3  opportunity to read it."  *Schmidt v. Samsung Electronics Am., Inc.*, No. C16-1735JCC,

4  2017 WL 2289035, at *2 (W.D. Wash. May 25, 2017).

5        Ms. Dougan denies that she had actual notice of the MPR Program's terms and

6  conditions.  Therefore, the court considers whether Ms. Dougan had constructive notice

7  of those provisions and concludes that she did.  "In the absence of actual knowledge, a

8  reasonably prudent consumer must be on constructive notice of the terms of the contract"

9  where the contract does not require the user to affirmatively assent to the terms of use.

10  *Wilson*, 944 F.3d at 1220.  "Users are put on constructive notice based on the

11  conspicuousness and placement of the terms and conditions."  *Id.*  Courts will not enforce

12  agreements where the terms and conditions are, for example, "buried at the bottom of the

13  page or tucked away in obscure corners of the website."  *Id.*

14        Here, TCP provided notice of the existence of terms and conditions governing the

15  MPR Program in several places:  in signs posted throughout TCP's retail store; in a

16  physical brochure that was displayed at each cash register and that, according to TCP's

17  policies, is handed to the customer when she signs up for the Program; and in emails that

18  require the customer to confirm her email address and that welcome her to the Program.

19  The signs, brochure, and emails each inform the consumer that the MPR Program is

20  subject to terms and conditions.  The signs and emails direct the customer to TCP's

21  website for more information about the terms and conditions, while the MPR Brochure

22  contains the actual terms.  TCP's website and the MPR Brochure both clearly state in

ORDER - 10

1  large bold type that the MPR Program's terms and conditions include an arbitration

2  agreement and class action waiver.  The court concludes that these disclosures were

3  adequate to provide Ms. Dougan constructive knowledge of the existence of terms and

4  conditions governing her membership in the MPR program.

5         Although Ms. Dougan states that she "never saw an email from TCP about any

6  terms and conditions relating to" the MPR Program, that assertion is not sufficient to

7  defeat TCP's motion, particularly where the emails she indisputably received included

8  links to the terms and conditions.  In addition, although Ms. Dougan states that she never

9  received a copy of the MPR Brochure, TCP's evidence of a consistent practice of

10  delivering the terms and conditions is *prima facie* evidence that she was aware of the

11  offer.  *Schmidt*, 2017 WL 2289035, at *5 (citing *Schwartz v. Comcast Corp.*, 256 Fed.

12  Appx. 515, 518 (3d Cir. 2017)).  In any event, the court concludes that the physical signs

13  in the retail store and the emails Ms. Dougan received placed her on constructive notice

14  that her membership in the MPR Program was governed by terms and conditions.  Had

15  she inquired further, she would have discovered that those terms and conditions included

16  an agreement to submit any disputes about the MPR Program to arbitration.

17         Finally, Ms. Dougan makes no argument that the terms and conditions governing

18  TCP's arbitration provision are unconscionable or otherwise unenforceable.  (*See*

19  *generally* Resp.)  Therefore, the court concludes that TCP has met its burden to show by

20  a preponderance of the evidence that Ms. Dougan assented to the terms and conditions

21  governing the MPR Program, including the arbitration agreement contained therein.  As a

22  result, the court finds that the arbitration agreement is valid and enforceable.

C.    **Stay of Proceedings**

When a court determines that an arbitration agreement covers a parties' claims, the FAA requires all remaining substantive issues to be decided in arbitration.  9 U.S.C. § 4. The final question for this court, therefore, is whether to dismiss or stay this case pending the completion of arbitration.  Under Ninth Circuit precedent, the court "may either stay the action or dismiss it outright when, as here, the court determines that all of the claims raised in the action are subject to arbitration."  *Johnmohammadi v. Bloomingdale's, Inc*., 755 F.3d 1072, 1074 (9th Cir. 2014) (citing 9 U.S.C. § 3).  Here, TCP requests a stay. (*See* Mot. at 14-15.)  Ms. Dougan does not respond to this request.  (*See generally* Resp.) Because Ms. Dougan has not opposed TCP's request that these proceedings be stayed pending the completion of arbitration, the court grants TCP's request for a stay.

## IV.    CONCLUSION

For the foregoing reasons, the court GRANTS TCP's motion to compel arbitration and stay proceedings (Dkt. # 11).  Ms. Dougan is compelled to proceed to arbitration of her claims in accordance with the terms of the arbitration agreement contained in the MPR Program terms and conditions.

Dated this 27th day of October, 2020.

JAMES L. ROBART
United States District Judge