UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ELAINE DOUGAN,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>THE CHILDREN'S PLACE, INC.,<br><br>　　　　　　　Defendant. | CASE NO. C20-0818JLR<br><br>ORDER GRANTING MOTION TO CERTIFY FOR INTERLOCUTORY APPEAL |

## I.　INTRODUCTION

Before the court is Plaintiff Elaine Dougan's motion to certify this court's October 27, 2020, order for interlocutory appeal under 28 U.S.C. § 1292(b).  (Mot. (Dkt. # 29); Reply (Dkt. # 33); Order (Dkt. # 27).)  Defendant The Children's Place, Inc. ("TCP") opposes the motion.  (Resp. (Dkt. # 32).)  Having considered the motion, the parties' submissions regarding the motion, the relevant portions of the record, and the

//

//

ORDER - 1

applicable law,[1] the court GRANTS Ms. Dougan's motion to certify.

## II. BACKGROUND

**A.     Factual Background[2]**

Ms. Dougan's suit is a proposed class action arising from her allegations that TCP sent emails with subject lines advertising false or misleading discounts to Ms. Dougan and others in Washington. (*See generally* Compl. (Dkt. # 1).) TCP is a specialty retailer that sells apparel, accessories, footwear, and other items for infants and children online and in retail stores nationwide, including in Washington. (Alzate Decl. (Dkt. # 12) ¶ 2.) Ms. Dougan alleges that TCP "creates purported list prices for its products which are inflated far above the products' regular and true selling prices." (Compl. ¶ 13.) As a result, when TCP offers discounted and sale prices, "the list prices and claimed discounts are false and inflated because [TCP] rarely or never offers the products at their stated list price." (*Id.*; *see also id.* ¶¶ 14-16.)

On November 22, 2018, Ms. Dougan voluntarily enrolled in TCP's My Place Rewards Program ("MPR Program" or "Program") at a TCP retail store in Kennewick, Washington. (Alzate Decl. ¶ 3, Dougan Decl. (Dkt. # 15) ¶¶ 4-9.) The MPR Program provides loyalty points, discounts, and reward credit to TCP shoppers. (*See, e.g.*, Alzate Decl. ¶ 7, Ex. D at 3 (describing Program benefits).) TCP sends Program

---

[1] Ms. Dougan requests oral argument. (*See* Mot. at 1.) But the court finds oral argument would not be helpful to the disposition of this motion and therefore declines to hold oral argument. *See* Local Rules W.D. Wash. LCR 7(b)(4).

[2] The court laid out the facts of this case in detail (*see* Order at 2-6), but repeats them here as they are relevant for the court's analysis of whether interlocutory appeal is appropriate.

1  communications, offers, and reward certificates to Program members by email.  (*See id.*
2  at 6.)
3        TCP posts signage throughout its stores—including the store at which Ms. Dougan
4  shops—to advertise the MPR Program.  (Alzate Decl. ¶ 4 (describing TCP's general
5  policies and procedures); Hazard Decl. (Dkt. # 20) ¶ 2 (describing procedures at stores in
6  Washington and explaining where in the store the signs were posted); *see* Alzate Decl. ¶
7  4, Exs. A-C (signage).)  The following language appears in fine print at the bottom of
8  several of these signs:

> The My Place Rewards Program is provided by The Children's Place, Inc. and its terms may change at any time. For full Rewards Terms and Conditions, please visit childrensplace.com/rewards-terms.

11  (*See* Alzate Decl. Exs. A, C.)  Ms. Dougan states that she did not see any signs or notices
12  "about terms and conditions relating to the [MPR Program]" when she visited the
13  Kennewick store and enrolled in the MPR Program.  (Dougan Decl. ¶ 22.)  She does not,
14  however, deny that signs advertising the Program were posted in the store.  (*See*
15  *generally id.*)
16        In 2018, TCP's standard operating procedure in its Washington stores for enrolling
17  customers in the MPR Program required TCP's sales associates to ask a customer if she
18  was already a Program member or wanted to become a member before ringing up the
19  customer's sales transaction.  (Alzate Decl. ¶ 5.)  According to TCP, a customer who
20  wanted to enroll in the Program would provide her name and contact information,
21  including email address, to the sales associate.  (*Id.*)  The sales associate would then hand
22  the customer a printed copy of a brochure containing the MPR Program terms and

ORDER - 3

conditions ("MPR Brochure") along with an enrollment receipt. (Alzate Decl. ¶ 6; *see also* Hazard Decl. ¶ 4 (stating that Washington sales associates are trained to inform the customer that the document contains information on the terms and conditions and benefits of the MPR Program).) Printed copies of the MPR Brochure were also displayed and available in stands at each cash register in the store. (Hazard Decl. ¶¶ 5-8; *see id.* Exs. F-G.)

The MPR Brochure is a 30-page double-sided document that includes information about both the MPR Program and TCP's MPR Credit Card Program. (Hattis Decl. (Dkt. # 16) ¶ 4, Ex. B; *see also* Hattis Decl. ¶ 7, Ex. E (photographs of the April 2019 version of the printed brochure).) Nine pages of the MPR Brochure are dedicated to the MPR Program and 21 pages are dedicated to the MPR Credit Card Program. (*See* Hattis Decl. Ex. B.)

Each side of the MPR Brochure has a different cover. The MPR Program side has an orange cover and is entitled "MY PLACE REWARDS." (Hattis Decl. Ex. B at 2.) The cover does not mention that the brochure contains terms and conditions for the Program.[3] (*Id.*) The first mention of terms and conditions for the MPR Program appears on the inside cover of the brochure's contents in fine print under a description of the benefits provided with the MPR Program and MPR Credit Card Program. (*Id.* at 3 (stating "Turn page for terms and conditions.").) The second and third pages of the

---

[3] The MPR Credit Card Program side has a blue cover and is entitled "MY PLACE REWARDS CREDIT CARD." (Hattis Decl. Ex. B at 31.)

contents also refer to terms and conditions in fine print. (*Id.* at 4-5.) Like the store signage, these pages state, in relevant part:

> The My Place Rewards Program is provided by The Children's Place, Inc. and its terms may change at any time. For full Rewards Terms and Conditions, please visit childrensplace.com/rewards-terms.

(*Id.*)

The Program terms and conditions begin on the fourth page of the MPR Brochure with a message in large boldface type stating:

> PLEASE NOTE: THESE TERMS AND CONDITIONS CONTAIN AN ARBITRATION CLAUSE AND CLASS ACTION WAIVER. THE WAIVER AFFECTS HOW DISPUTES WITH THE CHILDREN'S PLACE ARE RESOLVED. BY ACCEPTING THESE TERMS AND CONDITIONS, YOU AGREE TO BE BOUND BY THIS ARBITRATION PROVISION. PLEASE READ IT CAREFULLY.

(*Id.* at 6.) The specific terms setting forth the "Applicable Law and Mandatory Agreement to Arbitrate on an Individual Basis" begin on the fifth page of the terms and conditions and the eighth page of the brochure. (*Id.* at 10.)

Shortly after a customer completed her enrollment in the MPR Program, TCP would send her two emails: an email asking the customer to confirm her email address and, subsequently, a welcome email that included the customer's MPR Program rewards number. (Alzate Decl. ¶ 8.) Each of these emails included a hyperlink to the full text of the terms and conditions on the MPR Program webpage of TCP's website. (*Id.*)

The following text appears at the beginning of the MPR Program terms and conditions webpage:

> PLEASE NOTE: THESE TERMS AND CONDITIONS CONTAIN AN ARBITRATION CLAUSE AND CLASS ACTION WAIVER. THE

WAIVER AFFECTS HOW DISPUTES WITH THE CHILDREN'S PLACE AND GYMBOREE ARE RESOLVED. BY ACCEPTING THESE TERMS AND CONDITIONS, YOU AGREE TO BE BOUND BY THIS ARBITRATION PROVISION. PLEASE READ IT CAREFULLY.

(Alzate Decl. ¶ 17, Ex. E at 1 (current website terms and conditions).)

On November 22, 2018, the TCP sales associate followed the general process above to enroll Ms. Dougan in the MPR Program. (Dougan Decl. ¶¶ 4-11.) Ms. Dougan states, however, that neither the TCP sales associate nor anyone else at the store handed her a copy of the MPR Brochure, nor did anyone say anything to her about the brochure or about terms and conditions that governed her membership. (Dougan Decl. ¶¶ 13-15, 18, 20-21.) Indeed, Ms. Dougan states that she never saw the MPR Brochure until August 2, 2020. (*Id.* ¶ 19.) Although Ms. Dougan states that she never saw an email from TCP "about any terms and conditions relating to the [MPR Program]" (Dougan Decl. ¶ 23), TCP's records show that Ms. Dougan received both the email asking her to confirm her email address and the welcome email on November 23, 2018 (Alzate Decl. ¶ 13). TCP's records also show that Ms. Dougan used her membership after she enrolled in the Program and was assigned reward coupons on November 24, 2018 and October 8, 2019. (*Id.* ¶ 14.)

**B.     Procedural History**

TCP filed a motion to compel arbitration on July 10, 2020. (Mot. to Compel (Dkt. # 11).) On October 27, 2020, the court concluded that:

> [T]he physical signs in the retail store and the emails Ms. Dougan received placed her on constructive notice that her membership in the MPR Program was governed by terms and conditions. Had she inquired further, she would

have discovered that those terms and conditions included an agreement to submit any disputes about the MPR Program to arbitration.

(Order at 11.) Thus, the court granted TCP's motion to compel arbitration and stayed all proceedings until the completion of the arbitration. (*Id*. at 12.)

Ms. Dougan now moves for an order certifying the court's October 27, 2020, order for interlocutory appeal. (Mot.) She contends that the following questions make interlocutory appeal appropriate:

> *First*, can a court find that an email provided constructive notice when that email has not been admitted into evidence or even proffered? *Second*, can constructive notice ever be provided *after* the conduct constituting assent occurs? *Third*, can fine print on a promotional sign posted in a store constitute constructive notice as a matter of law? *Fourth*, must notice of terms and conditions contain a call to action in order to bind a consumer to those terms and conditions? *Fifth*, is a company's affidavit of a consistent practice of handing customers a brochure *prima facie* evidence that the plaintiff had notice of the terms or does a plaintiff's sworn affidavit that she never received the brochure rebut this evidence? *Sixth*, does a brochure's contractual nature need to be obvious on its cover in order to provide constructive notice of the terms and conditions contained within it?

(*Id*. at 1 (emphasis in original).)

### III.    ANAYLSIS

**A.    Legal Standard**

A district court may certify an order for interlocutory appeal where the order (1) "involves a controlling question of law"; (2) "as to which there is a substantial ground for difference of opinion"; and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b); *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1025-26 (9th Cir. 1981). All three requirements must be met to certify an order for interlocutory appeal. *Villarreal v. Caremark LLC*, 85 F. Supp.

1  3d 1063, 1067 (D. Ariz. 2015). The party pursuing the interlocutory appeal bears the
2  burden of establishing that § 1292(b)'s requirements have been met. *Couch v. Telescope*
3  *Inc.*, 611 F.3d 629, 633 (9th Cir. 2010). Should the Court of Appeals exercise its
4  discretion to hear a certified appeal, "appellate jurisdiction applies to the *order* certified
5  to the court of appeals, and is not tied to the particular question formulated by the district
6  court." *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996) (emphasis in
7  original). As such, the court need only find that one aspect of its order merits
8  interlocutory appeal for certification of the entire order to be proper.

9  **B.    Controlling Questions of Law**

10        To establish that an order raises a controlling question of law, the party seeking an
11  interlocutory appeal must show that "resolution of the issue on appeal could materially
12  affect the outcome of the litigation in the district court." *In re Cement*, 673 F.2d at 1026.
13  An issue need not be dispositive to be controlling. *Sierra Foothills Pub. Util. Dist. v.*
14  *Clarendon Am. Ins. Co.,* No. CVF050736AWISMSNEWDJ, 2006 WL 2085244, at *1
15  (E.D. Cal. July 25, 2006). The Ninth Circuit has recognized that interlocutory appeals
16  may be appropriate in cases where a stay pending arbitration could result in "needless
17  expense and delay of litigating an entire case in a forum that has no power to decide the
18  matter." *Kuehner v. Dickinson & Co.*, 84 F.3d 316, 319 (9th Cir. 1996).

19        This court's order compelled arbitration for all of Ms. Dougan's claims because
20  she had constructive notice of the arbitration clause in the Program terms and conditions.
21  (*See* Order.) TCP contends that all six issues identified by Ms. Dougan for appeal are
22  collateral because no question is individually capable of determining whether Ms.

Dougan had constructive notice of the arbitration provision. (Resp. at 4.) But Ms. Dougan raises questions that go to whether the in-store signs, the emails she received, and TCP's brochures should be viewed as providing constructive notice. (*See* Mot. at 1.) The Ninth Circuit need only agree with Ms. Dougan on one legal issue for each form of constructive notice identified by this court—the in-store signs and the emails sent to Ms. Dougan—for Ms. Dougan's appeal to be successful. While no single question may control, the court sees no reason why interlocutory appeal should be barred when there are multiple ways the Ninth Circuit could reverse this court's order should it agree with Ms. Dougan on some of the questions she seeks to raise on appeal. The court does agree, however, that Ms. Dougan's two brochure-related questions are not controlling, as the court did not find that the brochures provided constructive notice. (*See* Order at 11; Mot. at 1 (questions five and six).)[4]

TCP also contends that Ms. Dougan's presented questions are not sufficiently abstract to be viewed as "question[s] of law." (Resp. at 5.) But all of Ms. Dougan's questions pertain to what the court may properly conclude to be constructive notice. (*See* Mot. at 1.) These questions are sufficiently legal in nature to justify interlocutory appeal. Thus, the court concludes that Ms. Dougan's non-brochure-related questions are questions of law that are sufficiently controlling to satisfy this prong of analysis.

---

[4] Should the Ninth Circuit exercise its discretion to hear Ms. Dougan's interlocutory appeal, however, it will not be bound to issue rulings only on controlling questions of law. *See Yamaha Motor Corp.* 516 U.S. at 205.

## C.     Grounds for Differences of Opinion

"To determine if 'substantial ground for difference of opinion' exists under § 1292(b), courts must examine to what extent the controlling law is unclear." *Couch*, 611 F.3d at 633.  A substantial ground for difference of opinion exists where "the circuits are in dispute on the question and the court of appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented." *Id*.  "[I]nterlocutory appellate jurisdiction does not turn on a prior court's having reached a conclusion adverse to that from which appellants seek relief." *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011).  Instead, substantial ground for a difference of opinion exists "where reasonable jurists might disagree on an issue's resolution." *Id*.  The court concludes that substantial grounds for a difference of opinion exists for four of the six questions that Ms. Dougan wishes to raise on appeal.  It addresses each question in turn.

Ms. Dougan contends that there are substantial grounds for differences of opinion on whether an email can be found to provide constructive notice when that email has not been admitted into evidence or proffered.  (Mot. at 4.)  Ms. Dougan has submitted several examples of courts disagreeing with this court's decision on this issue.  (*See* Mot. at 4-5 (citing *Hunichen v. Atonomi LLC*, No. C19-0615RAJ-MAT, 2019 WL 7758597, at *9 (W.D. Wash. Oct. 28, 2019), *report and recommendation adopted*, No. C19-00615RAJ-MAT, 2020 WL 1929372 (W.D. Wash. Apr. 21, 2020) ("The mere fact of the email delivery does not, as such, support the contention plaintiff was provided sufficient notice of additional terms."); *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 123 n.14 (2d Cir.

2012) (finding email containing terms and conditions to not be constructive notice after analyzing subject line and contents)).)  The Ninth Circuit does not appear to have addressed this issue, and this court concludes that substantial ground for difference of opinion exists on this question.

There is also substantial ground for difference of opinion on whether constructive notice can be provided after the conduct constituting assent occurs.  This court concluded that, in addition to in-store signs, disclosures in two emails directing Ms. Dougan to the TCP's website containing the terms and conditions constituted constructive notice.  (Order at 10-11.)  But these two emails were sent after Ms. Dougan enrolled in the program.  (Alzate Decl. ¶ 8.)  Several courts have previously found that, in order to be valid, notice must come before conduct that allegedly indicates assent.  *See, e.g.*, *Robbins v. Comcast Cable Commc'ns, LLC*, No. C19-05603RBL, 2019 WL 4139297, at *4 (W.D. Wash. Aug. 30, 2019) ("the central issue of concern in Washington in determining whether or not a consumer is bound by an alleged contract is whether the consumer has notice of and access to the terms and conditions of the contract prior to the conduct which allegedly indicates his or her assent") (quoting *Kwan v. Clearwire Corp.,* No. C09-1392JLR, 2012 WL 32380, at *9 (W.D. Wash. Jan. 3, 2012)).  The court concludes that substantial grounds for a difference of opinion exists on this question.

The same is true for Ms. Dougan's third question:  "Can fine print on a store promotional sign constitute constructive notice as a matter of law?"  (Mot. at 6.)  This court found that fine print on the bottom of in-store promotional signs provided constructive notice to Ms. Dougan.  (Order at 11.)  But the court also recognized Ninth

1  Circuit precedent that "[c]ourts will not enforce agreements where the terms and

2  conditions are 'buried at the bottom of the page or tucked away in obscure corners of the

3  website.'" (*Id.* at 10 (quoting *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1221 (9th Cir.

4  2019)).)  This court recognizes that a reasonable jurist could determine that the rationale

5  in *Wilson* could be extended to apply to in-store signs, and concludes that there are

6  substantial grounds for a difference of opinion on this question.

7        The court finds that substantial ground for difference of opinion also exists for Ms.

8  Dougan's fourth question:  "Must notice of the terms and conditions contain a call to

9  action in order to bind a consumer to the terms and conditions?"  (Mot. at 7.)  This court

10  found that the text on in-store signs directing Ms. Dougan to TCP's website for more

11  information regarding terms and conditions contributed to Ms. Dougan's constructive

12  notice.  (Order at 10-11.)  But in *Wilson v. Playtika, Ltd.*, the court concluded that the

13  "key question" in assessing the adequacy of notice was whether the notice informed a

14  reasonable user that by taking certain actions they were agreeing to be bound by the

15  referenced terms and conditions.  349 F. Supp. 3d 1028, 1037-38 (W.D. Wash. 2018).

16  While the court's decision in *Wilson v. Playtika, Ltd.* was in the context of terms and

17  conditions presented on a website, *id.*, the core question remains the same for TCP's in-

18  store signs.  This is especially true given that this court's conclusion that there was

19  constructive notice based in part on "the signs . . . direct[ing] the customer to TCP's

20  website for more information about the terms and conditions."  (Order at 10.)  Thus, the

21  court concludes there is substantial ground for difference of opinion on this question.

22  //

1  Ms. Dougan's fifth and sixth questions deal with TCP's brochures. As these

2 issues are not controlling, the court declines to analyze whether there are substantial

3 grounds for differences of opinion on these questions. *See supra* § III.B.

4 **D.      Materially Advance Ultimate Termination of the Litigation**

5  In order to satisfy 28 U.S.C. § 1292(b), an interlocutory appeal need not have a

6 final, dispositive effect on the litigation; it is enough that it "may materially advance" the

7 litigation. *Reese*, 643 F.3d at 688; 28 U.S.C. § 1292(b). "The use of § 1292(b) is

8 reserved for those cases where an intermediate appeal may avoid protracted litigation."

9 *Koehler v. Bank of Bermuda*, 101 F.3d 863, 865 (2d Cir. 1996) (citing *Milbert v. Bison*

10 *Labs*., 260 F.2d 431, 433-35 (3d Cir. 1958)). Ms. Dougan seeks to appeal an order

11 compelling arbitration. (Mot.) Should the Ninth Circuit determine TCP did not

12 demonstrate Ms. Dougan had constructive notice of the arbitration clause, then the parties

13 may avoid an unnecessary arbitration proceeding. Several courts in this circuit have

14 found the potential avoidance of costly arbitration processes to sufficiently advance

15 litigation such that this prong of § 1292(b) is satisfied. *See, e.g.*, *Lee v. Postmates Inc.*,

16 No. 18-CV-03421-JCS, 2019 WL 1864442, at *4 (N.D. Cal. Apr. 25, 2019) ("an appeal

17 before arbitration will still conclude more quickly than requiring arbitration to run its

18 course before the appeal begins"); *Galilea, LLC v. AGCS Marine Ins. Co.,* No. CV 15-84-

19 BLG-SPW, 2016 WL 1328920, at *6 (D. Mont. Apr. 5, 2016). This is especially true

20 when, as here, the order compelling arbitration is in a proposed class action, and appeal

21 may obviate many arbitrations, not just Ms. Dougan's. *See Lee*, 2019 WL 1864442,

22

at*3-*4. Thus, the court concludes that interlocutory appeal may materially advance the litigation in this matter.

In sum, the court finds that its October 27, 2020, order involves controlling questions of law as to which there is substantial ground for difference of opinion, and that immediate appeal may materially advance the ultimate termination of the litigation. 28 U.S.C. § 1292(b).

**E.   Timeliness**

TCP argues that Ms. Dougan's motion is untimely and should be denied on this basis. (Resp. at 12.) But TCP also acknowledges that "§ 1292(b) does not set forth a strict time period in which a motion to certify must be filed." (*Id.*) It also recognizes that the Ninth Circuit has not expressed a view as to what should constitute a timely initial request for certification." (*Id.* at 12 n.4.) The court concludes that Ms. Dougan has not been inexcusably dilatory, and declines TCP's invitation to deny Ms. Dougan's motion on this basis.

## IV.   CONCLUSION

For the foregoing reasons, the court GRANTS Ms. Dougan's motion to certify for interlocutory appeal (Dkt. # 29). It ORDERS that its October 27, 2020 order compelling arbitration in this matter (Dkt. # 27) be certified for appeal to the United States Court of Appeals for the Ninth Circuit. Ms. Dougan shall file her notice of appeal within ten days

//

//

//

of the filing of this order.  This certification does not affect the stay of proceedings ordered by the court in its October 27, 2020, order.

Dated this 26th day of February, 2021.

JAMES L. ROBART
United States District Judge

ORDER - 15